UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>          v.<br><br>KENNETH NG, *et al.*,<br><br>                  Defendants. | Case No. 15-cr-00323-SI-1<br><br>**ORDER DENYING DEFENDANT NG'S MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 66 |

On August 25 and September 16, 2016, the Court held evidentiary hearings on defendant Ng's motion to suppress. The Court heard testimony from defendant and from law enforcement agents involved with the probation search and subsequent interrogation of defendant. For the reasons set forth below, the Court DENIES the motion.

**BACKGROUND**

**I.    Defendant's version**

The following is taken from defendant's declaration and his testimony during the evidentiary hearing. On August 5, 2014, at approximately 7:53 a.m., Drug Enforcement Administration ("DEA") agents and Task Force Officers ("TFO") conducted a probation search at 768 24th Avenue in San Francisco, the residence of defendants Kenneth Ng and Flavia Lino. Defendant states that he was smoking a cigarette in his backyard when approximately 10 men in DEA jackets and vests, fully armed, came towards him with their guns drawn. Defendant states that the agents threw him to the ground and handcuffed him, and that he was kept on the ground for about 15 minutes. Defendant states that after the agents cleared the backyard, they allowed him to sit on a chair, still handcuffed, while agents searched his house. Defendant testified that he

was allowed to smoke while the officers conducted the search, and that he did so while handcuffed. Four uniformed officers from the South San Francisco Police Department arrived later. Defendant states that he asked to speak to his wife while the officers searched his house and that the agents said that he could not talk to her until the search was over.

The search took about an hour, ending at approximately 9:00 am. Defendant testified that the agents told defendant that they were taking him to the police station for questioning, and that he asked if he had a choice and the agents told him he did not. Defendant testified that at the time he was not wearing a shirt, and that an agent went inside the house to get a shirt for him to wear. Defendant testified that the agents took his handcuffs off to allow him to put on a shirt, and then agents placed him back in handcuffs before transporting him in an unmarked police car to the South San Francisco Police Station for questioning. Defendant's wife, co-defendant Lino, was transported to the police station separately, and she was interviewed first. Defendant claims that once at the police department, he was placed in an interview room where his handcuffs were removed. Defendant states that the interview room was approximately 6x8 feet. Defendant claims that while he waited for the interrogation to begin, a police officer was posted at the door, and at other times the officer would come and sit down in the room. Defendant testified that the officers did not give him anything to eat or drink, though he also stated that he did not request anything to eat or drink. Defendant also testified that when he needed to use the bathroom, he was escorted by a police officer to a toilet in a holding cell in the "jail" portion of the station.

Defendant testified he waited for an hour to an hour and a half in the interview room before the interrogation began. Special Agent Madden, TFO Sena and TFO Mahon conducted the interrogation. It is undisputed that the officers never gave defendant *Miranda* warnings. Defendant testified that he did not remember whether TFO Sena told him that he was not under arrest, and he testified TFO Sena did not tell him that he was free to leave. Defendant testified that during the interrogation, the agents told him that they had enough evidence to put his wife in federal prison for 25 years[1] and to put him away "for a long time." Defendant testified that the

---

[1] In his declaration, defendant stated that "the agents threatened that if I did not cooperate, my wife would 'do' 25 years." Ng Decl. ¶ 10.

agents told him that he could help himself and his wife if he helped them. Defendant testified that the officers provided him with some information about the investigation, and he states in his declaration that he "told them what they wanted to hear so that they would let me leave." Ng Decl. ¶ 10. Defendant testified that the interrogation lasted about one hour.

Defendant also testified that he is a drug addict, and that he had "probably" used drugs the night before the search. Defendant testified that he did not believe his drug use affected his ability to remember the main details of the events of August 5, 2014. Defendant also testified that he is a convicted felon, although he could not remember precisely how many convictions he had ("maybe 3 or 4").

## II.    The government's version

The following is taken from the officers' testimony and declarations. On the morning of and prior to the search, TFO Sena, who was acting in an undercover capacity in the methamphetamine investigation, called Lino to arrange a meeting that morning at her residence. When officers arrived to conduct a probation search pursuant to a search warrant, they knocked on the door and Lino opened the door. When Lino saw the uniformed DEA team, she attempted to shut the door and fled back into the residence. After the agents entered the residence, one of the agents found Lino in a storage room inside the residence.

TFO Fregoso was the first agent inside the residence, and he testified that he had his AR-15 rifle drawn.[2] TFO Fregoso saw defendant in the backyard, and based on the nature of the investigation and the fact that defendant was on probation, he ordered defendant to a prone position and defendant complied. TFO Fregoso testified that he did not throw defendant to the ground. TFO Fregoso placed defendant's hands, which were behind his back, in handcuffs. Fregoso searched the backyard, where he found a plastic bag containing drugs. TFO Fregoso testified that he kept his rifle pointed at defendant until other officers took over watching defendant. Fregoso then went to help search other portions of the residence, and when he returned

---

[2] Agent Madden testified that only two of the agents had rifles.

1    approximately 40 minutes later, he saw defendant talking to Agent Mahon, and he said that
2    defendant was smoking and was not handcuffed at that point.

3          TFO Singh testified that his role was to secure the outside perimeter of the house, and that
4    he entered the house 5-7 minutes after the officers had cleared the house. Singh testified that
5    when he entered the house he did not have his weapon drawn. Singh testified that he went to the
6    backyard and saw Ng sitting in a chair wearing handcuffs. Singh was responsible for watching Ng
7    while the other officers searched the house, and Singh testified that after approximately 15-20
8    minutes one of the officers took Ng's handcuffs off and Ng was allowed to walk around the
9    backyard and smoke.

10         Special Agent Madden testified that he was the officer who found Lino in the storage
11   room, and he handcuffed and searched her, and stayed with her while the other officers conducted
12   a protective sweep of the residence. Madden testified that his role during the search was as the
13   "finder," and that he seized all of the evidence gathered during the search. Madden testified that
14   when he went into the backyard, he seized the bag of drugs that Fregoso had found. Madden
15   testified that when he went to the backyard, Ng was sitting in a chair smoking, and he did not
16   recall whether he was handcuffed at that point or not.

17         Officer Mahon testified that when he entered the backyard, he saw Ng sitting and that he
18   was handcuffed. Mahon testified that he explained to defendant that there was an ongoing
19   investigation involving the selling of large quantities of crystal methamphetamine to an
20   undercover agent working for the DEA. Mahon testified that during the entire time he spoke to
21   Ng, his duty weapon was holstered. Mahon also testified that Ng's handcuffs were removed
22   during this conversation, and that Mahon might have been the agent who removed them. Mahon
23   stated in his declaration that he also explained to defendant that he was not under arrest and was
24   free to leave at any time. Mahon also stated that "[w]hen asked, NG agreed to come to the South
25   San Francisco Police Department on a voluntary basis for an interview regarding this matter. NG
26   agreed to such request." Mahon Decl. ¶ 5. It is undisputed that Ng's vehicle had recently been in
27   an accident, and the officers testified that because Ng could not drive his vehicle to the station,
28   they offered to transport him in an unmarked police car. The officers also testified that prior to

leaving the house, defendant walked inside the residence and grabbed a T-shirt and his belongings. The officers testified that during the drive, defendant sat in the front passenger seat and that he was not handcuffed.

Lino was interviewed first, and her interview took about an hour. Ng's interview began around 10:00 am. SA Madden, TFO Sena and TFO Mahon all testified that defendant was told that he was not under arrest and was free to leave any time, and that defendant agreed to provide a voluntary statement. The agents testified that the door for the interview room remained unlocked during the interview, and that at no time was defendant handcuffed. The agents testified the interview lasted for approximately 45 min. The agents testified that during the interview defendant never asked for any food or drink. Defendant did use the bathroom while at the station, however all visitors at the police department must be escorted the entire time while in the building. The agents testified that at no time did anyone threaten or coerce defendant to provide a statement, but that they did tell defendant that he could help himself out by providing information about the drug conspiracy. The agents testified that defendant was calm, cooperative and forthcoming during the interview, and that he provided detailed information about the involvement of himself, Lino, and co-defendant Michael Pon regarding two completed methamphetamine deals and a third attempted deal.

**DISCUSSION**

Defendant and his two codefendants, Flavia Lino and Michael Pon, are charged with conspiracy to distribute and possess with intent to distribute methamphetamine, and with distribution and possession of methamphetamine. Defendant moves to suppress the statements he gave during the August 4, 2014 interview on the ground that the agents violated defendant's Fifth Amendment rights by failing to provide *Miranda* warnings in what amounted to a custodial interrogation.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. *Miranda* warnings are required "only where there has been such a restriction on a

1    person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).
2    In determining whether someone is in custody, "the ultimate inquiry is simply whether there [was]
3    a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal
4    arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429
5    U.S. at 495)). It requires that a reasonable person would not "have felt he or she was not at liberty
6    to terminate the interrogation and leave," given the totality of the circumstances. *Thompson v.
7    Keohane*, 516 U.S. 99, 112 (1995). "The custody determination is objective and is not based upon
8    'the subjective views of the officers or the individual being questioned.'" *United States v.
9    Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (*quoting United States v. Kim*, 292 F.3d 969, 973
10   (9th Cir. 2002)).

11   Neither *Miranda* nor its Supreme Court progeny set down any bright line rule or specific
12   test for determining when someone is in custody and instead suggest that the totality of the
13   circumstances of each case must be examined to determine whether there was custody. *See
14   Yarborough v. Alvarado*, 541 U.S. 652, 661-62 (2004). The Ninth Circuit has identified five
15   factors relevant to the custody determination: "(1) the language used to summon the individual;
16   (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical
17   surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure
18   applied to detain the individual." *Bassignani*, 575 F.3d at 883 (citation and quotation marks
19   omitted). However, these factors are not exhaustive, as other factors may be pertinent to, or even
20   dispositive of, the custody question.

21   In the Court's view, the more prudent course would have been for the officers to provide
22   defendant with *Miranda* warnings and thus obviate the current dispute. However, after careful
23   consideration of the testimony presented, the Court concludes that under the totality of the
24   circumstances, defendant was not in custody. On the first factor, the Court does not find credible
25   defendant's testimony that the agents told him that he had no choice but to accompany them to the
26   station. The Court does find it credible that the officers told defendant that they had found drugs
27   at his residence during the probation search, that the officers asked defendant if he would go to the
28

station to provide a statement, and that defendant agreed to do so.³ This factor weighs heavily in favor of finding the interrogation non-custodial. The Supreme Court has several times found no custody where the defendant went to the police station voluntarily and left freely after questioning. *See Stansbury v. California*, 511 U.S. 318 (1994); *Beheler*, 463 U.S. 1121; *Mathiason*, 429 U.S. 492; *see also United States v. Crawford,* 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc); *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005).

The Court also does not find credible defendant's testimony that he was kept in handcuffs until he was placed in the interview room. All of the officers consistently and credibly testified that defendant was handcuffed for approximately 15-20 minutes at the beginning of the search, and that the handcuffs were then removed. This is also consistent with the August 6, 2014 report prepared by agent Mahon which states that "NG and LINO were unhandcuffed and transported under their consent to the South San Francisco Police Department for interview." Dkt. No. 66-2 ¶ 10.⁴ Defendant testified that he was permitted to smoke in the backyard during the search, and it is not clear how he would be able to do so with his hands cuffed. The Court also finds significant the fact that defendant admitted to being a drug addict, and that he had probably used drugs the night before the search. Although defendant testified that he did not believe his drug use affected his memory of the events in question, the Court finds that the fact that defendant is an addict who used drugs the night before is a factor that must be considered when evaluating defendant's credibility.

On the second factor, the Court examines "the extent to which the defendant was confronted with evidence of guilt." "The Ninth Circuit has found a defendant in custody when the interrogator adopts an aggressive, coercive, and deceptive tone." *Bassignani*, 575 F.3d at 884. *Compare United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987) (holding defendant

---

³ The Court also notes that the government entered into evidence a "Consent to Search" form signed by defendant on August 5, 2014, in which defendant consented to a search of his cell phone. The Court finds that this consent supports a finding that defendant went to the police station voluntarily.

⁴ Defendant argues that "unhandcuffed" in this sentence is a verb. For the reasons set forth above, the Court is not persuaded by this argument.

7

1  was in custody where "[t]he officers demanded to know why [Beraun-Panez] was lying and said
2  they knew the truth. They told him that witnesses had placed him at the scene, even though their
3  two witnesses had in fact stated only that they had seen a tan truck, like that Beraun–Panez used,
4  within several miles of [the site of the alleged crime]."), *with Norris*, 428 F.3d at 913 (holding
5  defendant was not in custody when the officers "did not attempt to challenge [the defendant's]
6  statements with other 'known facts' suggesting his guilt, they merely asked [him] about the
7  allegations."). The Court finds that on balance this factor weighs somewhat towards a finding of
8  no custody. Defendant claims that the agents threatened him that if he did not cooperate his wife
9  would "do" 25 years; the agents testified that they informed defendant about the investigation and
10 told him that they had enough evidence to put defendant's wife in prison for 25 years and
11 defendant in prison for a long time. However, there is no evidence that the agents challenged any
12 of defendant's statements with facts suggesting his guilt or that the agents used deception. All of
13 the agents testified that defendant was forthcoming and volunteered considerable information
14 during the interrogation. Further, defendant was aware based on the probation search that agents
15 had seized drugs at his house.

16  The third factor − the physical surroundings of the interrogation − weighs in favor of a
17 custodial finding. However, in *Mathiason*, the Court acknowledged that the environment at the
18 police station was coercive, but that *Miranda* does not apply simply because a coercive
19 atmosphere exists. *Mathiason*, 429 U.S. at 495.

20  Turning to the fourth factor, the Court finds that the duration of the interrogation was
21 somewhere between 45 minutes and an hour. The Ninth Circuit has found a defendant not in
22 custody when he was interrogated for "more than one hour" (following a detention during a parole
23 search), *Crawford*, 372 F.3d at 1052, and "approximately 45 minutes." *Norris*, 428 F.3d at 911.
24 Thus, this factor supports a finding that defendant was not in custody.

25  Finally, the Ninth Circuit has "consistently held that a defendant is not in custody when
26 officers tell him that he is not under arrest and is free to leave at any time." *Bassignani*, 575 F.3d
27 at 876 (discussing cases). Here, the Court credits the officers' testimony that defendant was told
28 that he was not under arrest and that he was free to leave, and this factor supports a non-custodial

finding.

Accordingly, the Court finds that under the totality of the circumstances, defendant was not in custody when he was interrogated on August 5, 2014.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendant's motion to suppress.

**IT IS SO ORDERED**.

Dated: September 30, 2016

SUSAN ILLSTON
United States District Judge